No. 16-14801-G

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

LNV CORPORATION,

Plaintiff–Appellant,

v.

BRANCH BANKING AND TRUST COMPANY,

Defendant–Appellee.

On appeal from the United States District Court
for the Northern District of Florida (No. 3:13-cv-00191)
*Honorable M. Casey Rodgers, Chief United States District Judge*

APPELLEE'S BRIEF

**Kenneth C. Johnston**
Texas State Bar No. 00792608
kjohnston@krcl.com
**David M. Clem**
Texas State Bar No. 24093543
dclem@krcl.com
KANE RUSSELL COLEMAN & LOGAN PC
1601 Elm Street, Suite 3700
Dallas, Texas 75201
(214) 777-4200
(214) 777-4299 (Facsimile)

**Philip A. Bates**
Florida State Bar No. 228354
pbates@philipbates.net
PHILIP A. BATES, P.A.
25 West Cedar Street, Suite 550
Pensacola, Florida 32502
(850) 470-1191
(850) 470-0441 (Facsimile)

No. 16-14801-G

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

LNV CORPORATION,

Plaintiff–Appellant,

v.

BRANCH BANKING AND TRUST COMPANY,

Defendant–Appellee.

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

Branch Banking and Trust Company certifies that the following is a complete list of interested persons and corporate disclosure statement in accordance with FED. R. APP. P. 26.1 and 11th Cir. R. 26.1–1.

1.    Robert Ackermann: Senior Vice President and Chief Litigation Officer for CLMG Corporation

2.    Philip A. Bates: Counsel for Branch Banking and Trust Company

3.    BB&T Corporation: Wholly-owned subsidiary of BB&T Corporation; publicly traded under symbol BBT

4.    Beal Bank USA: The parent company of LNV Corporation

5.    Branch Banking and Trust Company: Appellee, Cross-Appellant, and Defendant

6.    David M. Clem: Counsel for Branch Banking and Trust Company

i

7.      CLMG Corporation: Authorized loan servicer for LNV Corporation

8.      Edward P. Fleming: Counsel for LNV Corporation

9.      Randall T. Harris: Counsel for LNV Corporation

10.     Kenneth C. Johnston: Counsel for Branch Banking and Trust Company

11.     Honorable Charles J. Kahn, Jr.: Magistrate Judge in the underlying action

12.     Kane Russell Coleman & Logan PC: Law firm representing Branch Banking and Trust Company

13.     LNV Corporation: Appellant, Cross-Appellee, and Plaintiff

14.     Jeffrey S. Levinger: Counsel for LNV Corporation

15.     McDonald Fleming Moorhead: Law firm representing LNV Corporation

16.     James E. Pennington: Counsel for LNV Corporation

17.     Honorable M. Casey Rodgers: Chief United States District Judge in the underlying action

By:  /s David M. Clem
**David M. Clem**

**STATEMENT REGARDING ORAL ARGUMENT**

Branch Banking and Trust Company does not believe oral argument is necessary in this case. Naturally, should the Court decide that oral argument would be helpful, BB&T will prepare and present to the best of its ability.

TABLE OF CONTENTS

Statement Regarding Oral Argument ..................................................... iii

Table of Contents ............................................................................... iv

Table of Citations ................................................................................v

Statement of the Issues......................................................................1

Statement of the Case .......................................................................2

    A.  Introduction .............................................................................2

    B.  Factual Background....................................................................4

    C.  Proceedings in the District Court ...............................................6

Summary of Argument ......................................................................9

Argument.........................................................................................11

I.     The Participation Agreement Authorized BB&T to Act Without LNV's
      Consent ........................................................................................12

    A.  Participations Require Lenders to Act Decisively Post-Default..............12

    B.  The Participation Agreement Expressly Allocates Post-Default
        Authority to BB&T ...................................................................13

    C.  Georgia Canons of Construction Resolve Ambiguities In Favor Of
        BB&T ......................................................................................15

II.    LNV Failed To Prove Any Damages At Trial..............................................18

    A.  The District Court Applied The Correct Standards .................................19

    B.  Nothing in the Participation Agreement Entitles LNV to a
        Windfall Payment of the Full "Legal Balance" of the Loan..............22

    C.  The Trial Evidence Supports Only One Result: Zero Damages.............25

Conclusion ......................................................................................30

Certificate of Compliance .................................................................33

## TABLE OF CITATIONS

Cases

*Al & Zack Brown, Inc. v. Bullock*,
  518 S.E.2d 458 (Ga. Ct. App. 1999)....................................................28

*All Angles Const. & Demolition, Inc. v. Metro. Atlanta Rapid Transit Authority*,
  539 S.E.2d 831 (Ga. App. 2000)..........................................................19

*Barger v. City of Certersville, Ga.*,
  348 F.3d 1289 (11th Cir. 2003) ...........................................................29

*Benchmark Builders, Inc. v. Schultz*,
  711 S.E.1d 639 (Ga. 2011) .................................................................30

*Bigelow v. RKO Radio Pictures*,
  327 U.S. 251 (1946)..........................................................................22

*Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*,
  604 F.2d 464 (7th Cir. 1979) ..............................................................12

*Continental Bank, N.A. v. Old Kent Bank & Trust Co.*,
  No. 93-C-608, 1994 WL 710301 (N.D. Ill. Dec. 20, 1994) .......................... 14, 15

*EZ Green Assoc. v. Georgia-Pac. Corp.*,
  770 S.E.2d 273 (Ga. Ct. App. 2015).....................................................22

*Federated Bank v. FDIC*,
  645 Fed. Appx. 853 (11th Cir. 2016)..................................... 11, 20, 23

*First Nat'l Bank of Louisville v. Continental Illinois Nat'l Bank & Trust Co.*,
  933 F.2d 466 (7th Cir. 1991) ........................................................ 13, 14

*Green v. Key Custom Homes, Inc.*,
  692 S.E.2d 56 (Ga. App. 2010)............................................................23

*Mark Twain Bank v. Continental Bank, N.A.*,
  817 F. Supp. 792 (E.D. Mo. 1993) .......................................................14

*McDow v. Dixon*,
  226 S.E.2d 145 (Ga. Ct. App. 1976).....................................................28

*PNC Bank, N.A. v. Branch Banking and Trust Co.*,
  466 Fed. Appx. 766 (11th Cir. 2012) ............................................................ 24, 25

*Stonegate Bank v. TD Bank, N.A.*,
  596 Fed. Appx. 834 (2015) ............................................................ passim

*Sun Am. Bank v. Fairfield Fin. Servs.*,
  690 F. Supp. 2d 1342 (M.D. Ga. 2010) ............................................................20

*Webb v. Hancock Plumbing, etc. Co.*,
  391 S.E.2d 697 (Ga. App. 1990) ............................................................23

*Willesen v. Ernest Comm's, Inc.*,
  746 S.E.2d 755 (Ga. Ct. App. 2013) ............................................................ 24, 25

Statutes
GA. CODE ANN. § 13-6-2 ............................................................24

## STATEMENT OF THE ISSUES

**Issue One (Breach):**    Did the district court err in deciding that BB&T had breached the participation agreement—after borrowers defaulted—by acting as the lead bank and negotiating a resolution that maximized recovery under the troubled loan and provided a significant profit to LNV?

**Issue Two (Damages):**   Did the district court correctly determine that LNV failed to prove any damages because it failed to show, without resorting to "gratuitous speculation," that the negotiated resolution damaged LNV in any way?

## STATEMENT OF THE CASE

### A.    Introduction

This appeal represents LNV's[1] latest attempt to wring even more profit out of a troubled loan. LNV bought a minority interest in a participated loan, for pennies on the dollar, after borrowers had defaulted. [Doc. 218 p.3–4]. BB&T prosecuted the defaults as lead bank, regularly communicating with LNV along the way. [Doc. 244 p.27:8–28:6]. In August 2011, BB&T reached an agreement to resolve the loan defaults by assigning the loan to one of the guarantors for $2.5 million. [Doc. 218 p.5]. Before the assignment was finalized, LNV objected to the assignment, arguing that the participation agreement required unanimous consent. [Doc. 218 p.7].

After careful review by its counsel, BB&T concluded that the participation agreement authorized it to act without LNV's consent in a post-default environment. [Doc. 240 p.117:9–118:5]. It consummated the assignment in November 2011 and paid LNV its proportionate share—giving LNV almost $300,000 in profit above its initial $197,000 purchase price. [Doc. 241 p.8:9–17; 13:12–14:3]. While the assignment maximized both banks' recovery under the failing loan, it resulted in a

---

[1] Abbreviations used in this brief: "LNV" means "LNV Corporation." "BB&T" means "Branch Banking and Trust Company." "Doc" refers to the district court's docket. "P.Ex." and "D.Ex." refer, respectively, to Plaintiff's Exhibit and Defendant's Exhibit. "LNV Brief" means LNV's Appellant's Brief, filed in this appeal.

*loss* of about $3.5 million to BB&T, which had paid about $18 million for its interest. [Doc. 243 p.212:13–216:25].

LNV used its profits to fund this lawsuit against BB&T. Essentially, LNV argued that (a) the participation agreement gave LNV "veto power" over all of BB&T's decisions, and (b) BB&T should have collected 100% of the loan, no matter how long that might take or how much that might cost. [Docs. 117, 240 p.214:10–13]. At summary judgment, the district court concluded that the participation agreement required LNV's consent, despite contractual language that empowers BB&T to take unilateral action after borrower default and contrary to industry standards. [Doc. 157; D.Ex. 1 p.4]. BB&T respectfully disagrees with the district court's conclusion.

The parties tried the issue of LNV's alleged damages to the court. Ultimately—after three years of discovery and five days of trial—LNV failed to show that it suffered any damages. [Doc. 218 p.18]. It presented zero expert testimony in support of its alleged damages. It offered no analysis or evidence of the value of its participation interest at any specific point in time (or the present or future value of that interest); the legal maneuvers it might take (and the cost of those maneuvers) to achieve a judgment against the obligors; or the chances of success in the underlying lawsuits or in later collection efforts. [*See* Doc. 218].

**B.    Factual Background**

This appeal arises out of a failed real estate development. Two entities, called "Owls Head" and "JLD Freeport," borrowed almost $36,000,000 in 2005 to acquire and develop 1,000 acres of raw land in the Florida panhandle. [D.Ex. 88]. To finance the project, the borrowers secured separate credit facilities from Colonial Bank. Owls Head borrowed about $26,000,000 [D.Ex. 5] and JLD Freeport borrowed about $10,000,000. [D.Ex. 13]. Three individuals guaranteed the loans. [D.Ex. 26, 28, 29].

Colonial Bank then sold 23.08% of the Owls Head Loan to Magnet Bank. [D.Ex. 1]. It did not sell any of the JLD Freeport Loan. A Participation Agreement *that Magnet Bank drafted* governed the rights and obligations of the Owls Head lenders. [D.Ex. 1, footer: "Magnet Bank Form Participation Agreement"].

When the real estate market crashed, both borrowers defaulted and the property was never developed. [Doc. 241 p.208:5–8]. A governmental entity called a CDD took a first-position lien against the Owls Head property in connection with funding improvements. [D.Ex. 136 p.1–2]. The market crash caused both banks to fail and FDIC placed them into receiverships. BB&T purchased Colonial Bank in a "whole bank transaction" effective August 14, 2009 [P.Ex. 3]. BB&T paid "book value" for its assets—about $18,000,000. [Doc. 243 p.214:22–24]. LNV bought Magnet Bank's interest in the Participation Agreement in a single-asset purchase in

September of 2009 for the heavily discounted price of $197,000. [Doc. 241 p.8:9–9:8].

That month, BB&T filed lawsuits against the borrowers and guarantors to collect on the Owls Head and JLD Freeport Loans. [Doc. 218 p.4]. Throughout the course of the Owls Head litigations, BB&T sent LNV periodic status updates. [Doc. 241 p.171:18–172:24]. BB&T notified LNV of motions, hearings, counterclaims, and invited LNV to two mediations involving the Owls Head Loan. [D.Ex. 49, 50, 55, 60, 65]. LNV never commented on any of these notices, never objected to any litigation strategy, and never appeared at mediation. [D.Ex. 119, 240 p.98:21–99:3].

After almost two years of litigation, BB&T reached an agreement with the solvent guarantor. BB&T agreed to assign the Owls Head Loan to the guarantor for $2,500,000 and the JLD Freeport Loan for $7,500,000. [D.Ex. 22, 23, 69]. Collectively, the sale price captured 65% of the guarantor's liquidity. [D.Ex. 136 p.4].

The parties reached the agreement at mediation on August 18, 2011. [D.Ex. 69]. After the mediation, but before the assignment was finalized, BB&T notified LNV of the purchase agreement. [D.Ex. 70]. LNV objected to the assignment, claiming that it did not have sufficient information to evaluate whether the sale price represented a good deal. [Doc. 240 p.207:8–209:4]. In accordance with the

Participation Agreement, BB&T asked whether LNV wished to purchase BB&T's share of the loan. [D.Ex. 75, 77]. LNV declined the purchase offer.

Concluding that the Participation Agreement authorized it to proceed without LNV's consent, BB&T completed the assignment on November 29, 2011. [D.Ex. 22, 23]. BB&T then forwarded $577,000 to LNV, representing LNV's 23.08% share of the $2.5 million sale price for the Owls Head Loan. [Doc. 218 p.7]. The payment represented a profit to LNV of about $300,000. [Doc. 241 p.13:12–14:3].

## C.    Proceedings in the District Court

LNV sued BB&T in September 2012. LNV claimed, among other things, that BB&T breached the Participation Agreement by assigning the Owls Head loan without LNV's consent. [Doc. 1]. LNV has two damages theories:

**First**, LNV sought damages based on what it claims *would have happened* had BB&T not assigned the loan for a payment of $2.5 million. For example, its complaint sought damages based on amounts that "would have been recoverable" from obligors. [Doc. 42 p.12].[2]

**Second**, LNV sought to enforce the repurchase provision of the agreement [Doc. 42 p.12]. This theory asks for payment of the full amount of the loan— despite the fact that the loan was already defaulted and dramatically

---

[2] LNV moved for leave to file a Second Amended Complaint on the eve of trial; the district court denied leave. [Doc. 200]. LNV's operative complaint is its First Amended Complaint. [Doc. 42].

undersecured when LNV bought its interest. The theory also ignores the plain language of the agreement, which states that BB&T "shall have no obligation to repurchase the Participation . . . in any other event whatsoever" [D.Ex. 1 p.3] and "[BB&T] shall have the right, but not the obligation, to repurchase Participant's Participation." [D.Ex. 1 p.4].

At summary judgment, the district court examined the Participation Agreement to determine whether LNV's consent was required. BB&T argued that the language in Paragraph 14(c)—which applies after borrower's default—permitted BB&T to act without consent "if [BB&T] and [LNV] cannot agree upon a mutually acceptable course of action." [D.Ex. 1 p.4]. The district court disagreed with BB&T, concluding that LNV's consent was required. As BB&T will explain below, the district court's reading of the agreement—and the specific paragraph that deals with post-default authority—renders a significant portion of the agreement meaningless.

On the issue of damages, the district court swiftly rejected LNV's "second" damages theory—the repurchase theory. [Doc. 157 p.11–12]. The court wrote that the agreement "does not *obligate* BB&T to pay LNV its share of principal and interest on the loan, or to otherwise 'repurchase' LNV's interest in the loan." [*Id.*]. As a result, the district court reserved the issue of damages for trial. [Doc. 157].

As a result, after the summary judgment order, only one damages theory remained: what LNV claims would have happened if BB&T had not resolved the

default by assigning the Owls Head Loan for value. This is the theory recognized by the Magistrate Judge relatively early in the case, who wrote that the central issue "is what BB&T (and therefore LNV) could realistically recover from the guarantors." [Doc. 92 p.17]. The Magistrate Judge also observed that if BB&T's recovery on the Owls Head Loan was "fair and reasonable, LNV would not have 'sustained an actual injury-in-fact necessary to pursue the claims alleged.'" [Doc. 92 p.7].

LNV explicitly recognized this theory in its trial brief, telling the district court that:

> LNV's damages are determined by its rights under the Participation Agreement and/or **the amount that BB&T could have collected on the Loan**. Ultimately, this fact will be determined by the amount owed on the loan (which is undisputed), the borrower's and/or guarantors' assets or net worth, and the value of any collateral securing the Loan. [Doc. 184 p.8–9, emphasis added].

After trial, LNV submitted a "Notice of Supplemental Authority" that purported to address the district court's questions regarding amounts that "likely would have been collected" from the guarantors. [Doc. 212]. That notice cites to several legal malpractice cases that the district court found "instructive." [Doc. 218 p.18]. Those cases essentially provide a common sense framework for LNV's damages model—what *would have happened*. Specifically, the cases ask the questions (a) would BB&T have won the underlying judgment and (b) how much— if any—would BB&T have collected above what it had already collected? [*See* Doc. 218 p.18].

In its brief, LNV feigns surprise that the district court applied these questions to LNV's evidence—claiming that it "was unaware during trial that it would be held to this elevated standard of proof." [LNV Brief p.25]. But not only are these questions consistent with Georgia law[3] and with common sense—they are the questions that LNV has urged during the life of this case, in its pleadings and briefs.

Applying these questions to the evidence submitted at trial, the district court was "not persuaded that BB&T's decision to settle the lawsuit without LNV's consent damaged LNV at all." [Doc. 218 p.18]. The district court entered a take-nothing judgment in favor of BB&T on all counts. [Doc. 218 p.25].

## SUMMARY OF ARGUMENT

The district court erred in deciding that the Participation Agreement required unanimous consent for BB&T to assign the Owls Head Loan. Paragraph 14(c) of the agreement contains a specific mechanism for resolving co-lender disputes about what steps to take after a default. Yet the district court found that Paragraph 14(a)— a more general provision that does not refer to defaults—controls over the later, default-specific language. At the very least, the agreement presents an ambiguity that this Court should resolve with reference to the canons of construction. Analogous authority resolves the ambiguity in favor of BB&T—including this Court's decision in *Stonegate Bank v. TD Bank, N.A.*, 596 Fed. Appx. 834 (2015), a

---

[3] Georgia law applies. [Doc. 218 p.9 n.8].

very similar case that interprets a participation agreement pursuant to principles of Georgia law.

Despite the district court's ruling on breach, it correctly determined that LNV failed to prove its alleged damages. The court applied the correct legal standards, consistent with Georgia's law on damages and consistent with LNV's own arguments and authorities. The district court also correctly ruled that nothing in the Participation Agreement or anywhere else permits the enormous windfall that LNV seeks by asking for payment of the full "legal balance" of the loan. The loan's "legal balance"—the full amount technically owed on the loan—was never in play for either lender, both of whom acquired their interests after the market crashed, the borrowers defaulted, and the obligors were in severe financial distress.

Despite the plain language of the agreement that gives BB&T the "right" but not the "obligation" to repurchase LNV's interest, LNV continues to press this argument. The reason is clear: LNV wholly failed to prove any damages. As the district court noted, LNV did not even *propose* a damages figure aside from the full legal balance. [Doc. 218 p.24]. Even if it had proposed a number, it offered no evidence in support: no expert testimony, no appraisal of the value of its interest in the loan, no calculations of the money or time it would take to reach a judgment and ultimately collect. Faced with this lack of evidence, the district court reached the

only conclusion it could—"LNV has failed to prove its damages for breach of contract by a preponderance of the evidence." [Doc. 218 p.25].

The Court should affirm the district court's judgment on both of the foregoing issues: BB&T did not breach the agreement and LNV did not prove damages.

## ARGUMENT[4]

The Court will recognize this fact pattern as similar to a series of recent Eleventh Circuit cases involving attempts by minority loan participants to extract more money from defaulted loans than their lead banks were able to achieve. Those cases include *Sunsouth Bank v. First NBC Bank*, No. 16-12380 (op. issued Jan. 30, 2017), *Sentinel Capital Orlando, LLC v. Centennial Bank*, No. 15-14904 (op. issued Jan. 20, 2017), *Federated Bank v. FDIC*, No. 15-11946 (op. issued Mar. 9, 2016), and *Stonegate Bank v. TD Bank, N.A.*, No. 13-14000 (op. issued Jan. 6, 2015). LNV addressed none of these cases. In fact, despite the breadth of cases on the topic, LNV's brief cites only a single case that even mentions participation agreements.

---

[4] This appeal presents two issues: breach and damages. LNV's issues all relate to damages. This chart depicts the sections where BB&T addresses LNV's arguments:

| LNV BRIEF | BB&T BRIEF |
|:---:|:---:|
| I | II.B |
| II.A | II.A |
| II.B, C, D | II.C |
| III | II.A |
| IV | II.C |
| V | II.C |

LNV's brief implicitly recognizes that its appeal attempts to chart new territory by seeking damages without establishing proof.

These authorities, among others cited in this brief, establish that (I) the Participation Agreement authorized BB&T to act without LNV's consent and (II) LNV failed to prove any damages.

## I.    THE PARTICIPATION AGREEMENT AUTHORIZED BB&T TO ACT WITHOUT LNV'S CONSENT

BB&T was authorized to act without LNV's consent—either by the express terms of the agreement or by reference to Georgia canons of contract construction.

### A.    Participations Require Lenders to Act Decisively Post-Default

Courts recognize the need for lenders in participated loans to speak with a single voice after a borrower default. For example, in *Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*, 604 F.2d 464 (7th Cir. 1979), the court considered whether the lead bank had the authority to accelerate a loan and foreclose on collateral over a participant's objections. The court found that the participation agreement delegated a great deal of authority to the lead bank. While the lead bank "might not have the implicit power to modify the loan without the owner's consent, it is manifest that in the context of a participation agreement, some party must have the authority to decide whether to modify or foreclose." *Id.* at 470. Because such power was not given to the participant, the court found that it was properly vested in the lead bank. *Id.*

If post-default power was not vested in a single lender, minority participants would essentially have veto power over the loan. Courts uniformly disfavor such a condition. *See, e.g., First Nat'l Bank of Louisville v. Continental Illinois Nat'l Bank & Trust Co.*, 933 F.2d 466 (7th Cir. 1991) (affirming summary judgment in favor of lead bank where participant objected to action of lead bank). If a single, minority participant were permitted to veto the post-default strategy of the lead bank, the participant could impose its own self-interests onto the lead bank, to the detriment of the remaining lenders. *Id*.

### B.    The Participation Agreement Expressly Allocates Post-Default Authority to BB&T

The Participation Agreement in this case expresses the foregoing principle, providing a mechanism for resolving disputes about what steps to take after borrower default. Paragraph 14(c):

> Within five (5) Business Days after notification to Participant by Seller of a Default, Seller and Participant shall consult to determine a mutually acceptable course of action to take with respect to such Default, it being agreed that **if Seller and Participant cannot agree upon a mutually acceptable course of action, then the decision of Seller, shall determine what action shall be taken**. [D.Ex. 1 p.4].

This provision serves the purpose of consolidating the authority of the lenders in a post-default scenario. Because BB&T had the largest interest in the Owls Head Loan, it had the most money to lose once the borrower defaulted. If BB&T did not have this authority, LNV would have a "veto" power that would allow it to hold

BB&T hostage—benefitting LNV's minority interest at the expense of BB&T's majority interest. *See Mark Twain Bank v. Continental Bank, N.A.*, 817 F. Supp. 792, 802 (E.D. Mo. 1993) ("It would be ludicrous for one Participant with a $5 million share of the $85 million loan to be able to jeopardize the interests of the Lenders (of the remaining $80 million) as [participant] proposes."). In Judge Posner's words, such a result would "arm[] one bank to take advantage of the forbearance of others." *First Nat'l Bank of Louisville v. Continental Illinois Bank & Trust Co,* 933 F.2d 466, 470 (7th Cir. 1991).

The court in *Continental Bank, N.A. v. Old Kent Bank & Trust Co.*, No. 93-C-608, 1994 WL 710301 (N.D. Ill. Dec. 20, 1994), considered a similar provision. In that case, the lead bank agreed to release certain collateral for the benefit of borrower's affiliate in exchange for $3 million. The lead bank arranged to release the collateral after the borrower had defaulted but over the objections of its participant.

The operative agreement between the parties prohibited the lead bank from agreeing to "any amendment, modification or waiver of any provision of the Loan Agreement" without prior written consent of the participant. However, the agreement contained a separate provision that delegated post-default authority to the lead bank:

> Upon the occurrence of an event of default hereunder, Bank [Old Kent] may thereafter transfer any of the Collateral to itself or its nominee, and

may enter into extensions, reorganizations, deposits, mergers, consolidations, or other agreements relating to or affecting any of the Collateral, and in connection therewith may deposit or surrender control of any of the Collateral, accept other property in exchange therefor, and perform such other acts and things with reference to the Collateral as it deems desirable and proper. *Id.* at *3.

The *Continental Bank* court found that the language was unambiguous, and that it "allow[ed] [the lead bank], in the event of [borrower]'s default, to dispose of the collateral at its discretion." Consequently, the lead bank's release of collateral without the participant's consent did not constitute a breach of the participation agreement.

Just like *Continental Bank*, the Participation Agreement in this case contains a paragraph that identifies specific actions that require participant's consent. Also like *Continental Bank*, the Participation Agreement delegates post-default authority to BB&T. Under Paragraph 14(c), BB&T was entitled to "determine what action shall be taken" in the event of borrower's default.

## C.     Georgia Canons of Construction Resolve Ambiguities In Favor Of BB&T

The district court found no ambiguity in the Participation Agreement—instead reading Paragraph 14(c) as subordinate to Paragraph 14(a). [Doc. 157 p.6–8]. But that reading renders an important portion of Paragraph 14(c) meaningless. Paragraph 14(a) lists four categories of actions that BB&T may not "take or omit to take" without LNV's consent. Those categories include "modification, amendment, or

15

termination" of loan document terms, or the "release, substitution or exchange" of collateral. [D.Ex. 1 p.4].

If the district court's reading was correct, almost every conceivable action by BB&T would require unanimous consent, regardless of whether the loan was in default—for what actions could BB&T take post-default that would not fall within the categories described in Paragraph 14(a)? The district court's reading would mean that BB&T could not sue, foreclose, or negotiate a settlement or workout of a default without LNV's consent. And if that was so, what is the meaning of 14(c)?

At the very least, the relationship between Paragraphs 14(a) and (c) presents an ambiguity. The ambiguity is similar to that examined by this court in *Stonegate Bank v. TD Bank, N.A.*, 596 Fed. Appx. 834 (11th Cir. 2015). The participation agreement in that case contained two provisions defining the lead bank's authority: one that prohibited TD Bank from changing the "material terms" of the loan documents without supermajority consent and another that granted broader authority to the lead bank after the borrower's default.

The two *Stonegate* provisions interact in the same way that Paragraphs 14(a) and 14(c) interact in this appeal. Predictably, the parties made similar contentions to those presented here. Stonegate, the participant, argued that Paragraph 16(b) controls—that "supermajority" consent was required to implement courses of action that would result in a material change "regardless of whether the Loan is in default."

16

TD Bank, as the lead, argued that 16(b) authorizes "broad conduct, including a full sale of the Loan," in a post-default context.

This Court applied Georgia principles of contract construction to resolve the ambiguity in favor of TD Bank. The Court observed that "the construction which will uphold a contract in whole and in every part is to be preferred." *Id.* at 843. As demonstrated above, the district court's reading obviates a large portion of Paragraph 14(c)—rendering any of BB&T's post-default authority meaningless. The district court also found that the phrase "except as otherwise provided" at the beginning of Paragraph 14(a) modifies the entire paragraph, not just the introductory sentence. [Doc. 157 p.7]. But that reading renders the balance of the sentence meaningless. The first sentence of Paragraph 14(a) essentially authorizes BB&T to exercise any right, without consent, "upon the occurrence of a default under the Loan Documents *or at any other time*." [D.Ex. 1 p.4]. In other words, the sentence is a broad grant of all authority at all times, subject to more specific limiting language. The next sentences in that paragraph provide limits: after default, BB&T must notify LNV, and if the lenders cannot agree on a course of action, BB&T's decision governs. [*Id.*].

Another canon identified in *Stonegate* is *contra preferentem*: "doubtful constructions should be construed against the instrument's drafter." *Stonegate*, 596 Fed. Appx. at 844. In this appeal, it is undisputed that Magnet Bank—LNV's

predecessor-in-interest—drafted the Participation Agreement. [D.Ex. 1, footer]. As a result, the Court must resolve doubts in favor of BB&T.

The final canon identified in *Stonegate* is the "specific over general" rule. *Stonegate*, 596 Fed. Appx. at 845. This rule strongly supports BB&T's interpretation, because the dispute resolution mechanism in Paragraph 14(c) specifically refers to post-default actions—unlike Paragraph 14(a), which does not contain similar limitations. In addition, Paragraph 14(c) is the only part of the agreement that addresses the scenario described by the authorities contained above in Part I.A—the "veto power" that Judge Posner and others warned against.

Because the Participation Agreement authorized BB&T to act without LNV's consent, the Court should affirm the district court's judgment on the grounds that no breach occurred.

## II.    LNV FAILED TO PROVE ANY DAMAGES AT TRIAL

LNV claims on appeal—as it claimed at trial—that it does not need to prove its damages. Rather, it argues that the Participation Agreement punishes *any* breach by requiring BB&T to pay the full "legal balance" of the loan to LNV. LNV's interpretation of the agreement essentially makes BB&T a guarantor of the underlying loan.

The district court examined this argument closely, at summary judgment and pretrial, finding against LNV both times. At summary judgment, the court wrote that

the Participation Agreement does not require BB&T to purchase LNV's interest and does not otherwise provide an automatic measure of damages. [Doc. 157 p.11–12]. In its pretrial order, the court wrote that LNV was not entitled to a presumption of damages, in part because LNV's interest in the Participation Agreement was "expressly subject to risk and loss." [Doc. 203 p.3]. As a result, the district court required LNV to "carry its burden at trial to establish the amount of its damages." [*Id.* p.4]. LNV failed to carry this burden.

## A.    The District Court Applied The Correct Standards

In a breach of contract case, "it is the plaintiff's burden to show the damages, and the plaintiff cannot do this by resorting to 'speculation, conjecture and guesswork.'" *All Angles Const. & Demolition, Inc. v. Metro. Atlanta Rapid Transit Authority*, 539 S.E.2d 831, 834–35 (Ga. App. 2000). Georgia state courts, as well as federal courts applying Georgia law, repeatedly apply this fundamental principle.

For example, this Court recently decided *Federated Bank v. FDIC*, 645 Fed. Appx. 853 (11th Cir. 2016)—a case strikingly similar to this appeal. In *Federated*, the participant bank complained that FDIC (as receiver for the lead bank) breached the participation agreement in a number of ways, including by failing to keep the participant informed. The district court dismissed the participant's breach of contract claim at summary judgment, and this Court affirmed. The central question in that

case—as in the current appeal—was what would have happened if the lead bank had

not breached the agreement. As this Court wrote:

> [T]he district court concluded that 'Federated has offered no evidence
> at all on how the FDIC's alleged failure to provide the requested
> information caused any damage suffered by Federated.' For example,
> Federated offered no evidence that it would have taken different action
> had it been aware of the information the FDIC allegedly failed to
> provide it. *Id.* at 859.

> The Court cited to *Sun Am. Bank v. Fairfield Fin. Servs.*, 690 F. Supp. 2d 1342

(M.D. Ga. 2010), another case involving a participant bank's suit against a lead bank

for breach of a participation agreement. In that case—*unlike* this appeal—the

participation agreement included a mandatory repurchase clause. As this Court

recognized, in the absence of such a clause, the participant must prove its damages

by showing what *would have happened*. This Court quoted *Sun American*,

acknowledging the difficulty but holding the plaintiff to its burden:

> Precise legal damages [from breach of contract similar to the one
> alleged here] would be impossible to calculate because such calculation
> would require speculation into what Sun American would have done
> with the information Fairfield was obligated to disclose. . . . It might
> have made good decisions, or it might have made bad decisions. . . . It
> is impossible to say. *Federated* at 859, quoting *Sun Am.* at 1368.

The district court in this case applied the same standard by analogizing to legal

malpractice cases. Essentially, the district court asked what would have happened—

did LNV prove that BB&T would have obtained and collected a judgment? [Doc.

218 p.18].

20

This standard comports with Georgia law and this Court's precedent. And, as shown above in Part C to BB&T's Statement of the Case, it is consistent with LNV's own arguments and authorities [E.g. Doc. 184, 212] and with pretrial orders from Chief Judge Rodgers [Doc. 157] and Magistrate Judge Kahn [Doc. 92].

In Part III of its brief, LNV asks the Court to apply a less severe standard, asking for "leniency" to prevent BB&T from profiting. [LNV Brief p.39]. Firstly, only one party profited from this transaction, and it was not BB&T. In fact, BB&T *lost* about three and a half million dollars on the Owls Head Loan [Doc. 243 p.212:13–216:25], and it would have lost even more if it had not reached a resolution. [*See*, *e.g.*, Doc. 218 p.22: the guarantor "had spent several hundred-thousand dollars in legal fees simply fighting BB&T's efforts to obtain a judgment, and was not running short of funds to finance his ongoing defense."].

Secondly—contrary to LNV's claim in its brief—the district court did consider the authorities cited in LNV's brief. The court did not require LNV to show its damages with "exact mathematical certainty." [Doc. 218 p.23, citing *EZ Green Assoc. v. Georgia-Pac. Corp.*, 770 S.E.2d 273, 277 (Ga. Ct. App. 2015)]. It sought only "a just and reasonable estimate of the damage based on relevant data." [Doc. 218 p.24, citing *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)]. LNV's evidence failed to meet even this lower standard of proof.

21

### B.    Nothing in the Participation Agreement Entitles LNV to a Windfall Payment of the Full "Legal Balance" of the Loan

In Part I of its argument, LNV again presses the claim that the Participation Agreement requires BB&T to pay LNV all of the money legally owed under the Owls Head Loan. LNV bases its argument on Paragraph 14(b) of the Participation Agreement, claiming that the paragraph's "purpose" was to set "the price BB&T would pay LNV if it wished to modify the loan documents without obtaining LNV's consent." [LNV Brief p.18]. This interpretation completely ignores the plain language of the paragraph, which says that "shall have the **right**, but not the **obligation**" to purchase LNV's interest. [D.Ex. 1 p.4, emphasis added].

LNV claims that requiring BB&T to pay the legal balance of the loan "would put LNV in as good a position as if BB&T had fully performed." [LNV Brief p.20]. This is false. In fact it would put LNV in a far better position than it would have been in under any plausible scenario. It would pay LNV more money than was ever available in the Owls Head Loan, ignoring the defaulted nature of the loan, the deteriorating value of the collateral, and the multiple obstacles to judgment and collection. [*See* D.Ex. 136 p.1–6, Doc. 218 p.2–8]. In short, it would award damages with no basis in reality, resulting in a windfall to LNV. Georgia law forbids this result: "An injured party cannot be placed in a better position than he would have been in if the contract had not been breached." *Green v. Key Custom Homes, Inc.*,

692 S.E.2d 56 (Ga. App. 2010), quoting *Webb v. Hancock Plumbing, etc. Co.*, 391 S.E.2d 697 (Ga. App. 1990).

LNV also argues that awarding the full legal balance of the loan is consistent with the "benefit of the bargain" struck by the parties when they executed the agreement. [LNV Brief p.20–22]. But the parties never bargained for BB&T to guarantee the loan or for LNV to receive any certain sum from its purchase. LNV bargained for a participant's share in a defaulted loan where it would share in "any losses and expenses sustained in connection with the loans." [D.Ex. 1 p.1]. Shared losses include those that "are a logical consequence of action taken by [BB&T], including without limitation action in response to a default under the Loan Documents." [*Id.* p.1–2]. LNV acquired the participation expressly "without recourse" to BB&T and for LNV's "own account and risk." [*Id.* p. 2]. *That* was LNV's bargain.

The district court in the *Federated* case addressed a similar "benefit of the bargain" argument from its participant bank, writing:

> [Participant]'s lack of evidence on causation is even more important considering the context of the Participation Agreement. [Participant] appears to have assumed throughout the litigation that it is entitled to a full return of its loan, but that is not what the parties bargained for in the Participation Agreement. The Participation Agreement was not a contract for goods or services; it was a loan with all of its attendant credit risks. In fact, the Participation Agreement itself anticipated that there could be losses on the loan, just as with any loan a bank might make. [Lead Bank] was never intended to be an insurer of the $1,000,000 loan participation made by [Participant]. *Federated Bank v.*

*FDIC*, No. 1:12-cv-03445, in the U.S. District Court for the Northern District of Georgia, Atlanta Div., Doc. 78 p.18 (Order entered April 1, 2015), *aff'd* 645 Fed. Appx. 853 (11th Cir. 2016). See appendix for copy of district court order.

As the district court pointed out, under Georgia law, contract damages must "arise naturally and according to the usual course of things" and "such as the parties contemplated, when the contract was made, as the probable result of its breach." [Doc. 218 p. 16, quoting GA. CODE ANN. § 13-6-2]. LNV claims that its damage model is consistent with this principle because it is based on BB&T's "reduction of the amount owed on the Owls Head loan." [LNV Brief p.23–25]. LNV took "the difference between the borrower's obligation under the loan documents and the amount actually received by BB&T, and multiplied the total shortfall by its participation percentage." [*Id.* p.24–25].

LNV's description of its damages calculation makes it clear that (a) the figures are not even remotely based on facts that might "arise naturally," and (b) LNV conflates the amount owed by the *borrower* under the promissory note with the amount it claims is owed by *BB&T* under the Participation Agreement. LNV's reference to the *PNC Bank* and *Willesen* cases does nothing to cure these defects.

In *PNC Bank, N.A. v. Branch Banking and Trust Co.*, 466 Fed. Appx. 766 (11th Cir. 2012), "the district court found that the damages PNC Bank suffered were caused by the breach of the participation agreement, not by bad market conditions." *Id.* at 772. In contrast, the district court in this appeal noted that "[u]nfavorable

market conditions" contributed to the loan defaults, "the value of the collateral underlying both loans dropped dramatically," and a CDD lien primed the lenders' lien in the Owls Head Loan, among numerous other issues that impacted the value of the loan. [Doc. 218 p.4–6].

*Willesen v. Ernest Comm's, Inc.*, 746 S.E.2d 755 (Ga. Ct. App. 2013) is similarly unavailing. In that case, the court interpreted a sales commission agreement, concluding that the agreement did *not* require payment by the customers in order for the sales agent to earn a commission. *Id.* at 761. That is completely different from the payment structure under the Participation Agreement, where LNV agreed to share in losses on the loan. [D.Ex. 1 p.1–2].

These arguments represent LNV's attempt to convince the Court that it did not need to prove its damages after all—that its interpretation of the Participation Agreement and a calculator carried its burden at trial. In LNV's words, "Nothing more was required." [LNV Brief p.25]. But, as the district court correctly wrote, much more was required for LNV to carry its burden of proof.

### C.    The Trial Evidence Supports Only One Result: Zero Damages

Parts II.B, C, and D, and Part IV of LNV's brief argue that LNV's trial evidence met its burden of proof. The district court's order abundantly refutes these arguments.

First—could BB&T have won a judgment for the full legal balance owed? If yes—how long would that take and how much would that cost? The trial record does not contain a complete analysis of the claims and defenses involved. [Doc. 218 p.18]. It does not even contain the full briefings related to the motion for summary judgment filed in the case. [*Id.* p.19]. This was a "complex and vigorously contested" case [*Id.*] in which BB&T had already received adverse rulings, including the trial court's denial of a motion to dismiss counterclaims [Doc. 244 p.47:12–20], refusal to designate the case as a "complex action," and passing on BB&T's motion for summary judgment [*Id.* p.124:2–13]. BB&T's lead trial counsel testified that it was possible that BB&T would lose the summary judgment. [*Id.* p.20:13–16; 21:10–13]. Even LNV's corporate representative testified that he could not guarantee a result in the litigation. [Doc. 241 p.34:5–21].

In the meantime, the Owls Head collateral values (which ultimately drove the assignment price) continued to plummet, the CDD (the superior lienholder) threatened to foreclose on the property, and the litigation costs were mounting. [Doc. 243 p.131:17–132:12; Doc. 136 p.1–4]. Taxes and operational costs related to the collateral property also continued to mount, as LNV's corporate representative also testified. [Doc. 241 p.37:7–38:14].

LNV offered zero evidence to contradict these facts, all of which impacted the litigation: the ***likelihood*** of winning a judgment, the ***costs*** associated with winning a judgment, and the ***time*** required to win a judgment.

Second—could BB&T have collected all of the judgment? With the same questions as before: over what period of time and at what cost? Initially, LNV's corporate representative simply testified that BB&T "absolutely" could have collected a judgment against the guarantor. [Doc. 240 p.213:22–25]. The representative later acknowledged that he could not guarantee a collection result. [Doc. 241 p.34:5–15]. He also acknowledged various asset protection capabilities of Florida debtors—capabilities that Chief Judge Rodgers expressly noted. [Doc. 241 p.38:17–41:19]. The guarantor's lawyers—one of whom represented that "he was doing the asset protection work" for the guarantor [Doc. 241p.289:8–16]—made numerous representations about the guarantor shielding his assets through marriage, estate planning, or otherwise. [*Id.* p.288:16–289:1]. And BB&T's officer testified that "getting a judgment is a long way from getting any money," with concerns about fraudulent conveyance lawsuits and asset protection efforts. [Doc. 240 p.86:16–87:2].

Once again,  LNV's evidence does not address these concerns. The record contains no evidence to prove collectability aside from the guarantor's financial statements—which reflected some "unrestricted liquidity" but more restricted assets,

27

including money pledged for letters of credit, closely-held business interests, securities, and other non-liquid assets. [Doc. 136 p.4–5]. LNV presented no evidence to show how a creditor would convert these assets to cash, how long those efforts might take, or how much they might cost to complete.

As LNV's own authorities demonstrate, Georgia law requires plaintiffs to demonstrate that a judgment "would have been collectible in some amount." *McDow v. Dixon*, 226 S.E.2d 145, 147 (Ga. Ct. App. 1976). Neither *McDow* nor any other authority relieves the plaintiff of the requirement to show, with "a reasonable degree of certainty," the amount that *would have been collected* if the judgment was won. [Doc. 218 p.24, citing *Al & Zack Brown, Inc. v. Bullock*, 518 S.E.2d 458, 463 (Ga. Ct. App. 1999)].

In Part IV of its brief, LNV asks this Court to do something that LNV itself declined to do at trial: pick a number less than the full legal balance of the loan. First, LNV asks the Court to award damages based on a reallocation of the $10,000,000 global settlement—asking for money that the guarantor paid for the JLD Freeport Loan in which LNV owned no interest. [LNV Brief p.49]. Incredibly, LNV quotes its opening statement, in which it made "perfectly clear" that "reallocation of the settlement" is "not our damage model." [LNV Brief p.51]. LNV's opening statement does make clear what its damage model is—the full value of the loan. [Doc. 240 p.30:6–16]. In none of its pretrial briefs, nor in its opening statement, nor in any

remark made during trial, did LNV indicate that it sought damages based on "reallocation" or "collateral values," as it now seeks in its brief. [LNV Brief p.49–52].

Not only did LNV specifically define its damage model, but the district court expressly relied upon LNV's statements. [Doc. 218 p.13 n.13]. BB&T relied upon the statements as well—it did not exhaust time or resources in addressing damage models that LNV had expressly disclaimed.

This Court should apply judicial estoppel to prevent LNV from urging damage models based upon "reallocation" or "collateral values." *Barger v. City of Certersville, Ga.*, 348 F.3d 1289, 1293–94 (11th Cir. 2003). Judicial estoppel is a flexible doctrine that prevents a party from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Id.* LNV's counsel made these statements as an officer of the court and a member of the bar. The current 180° change in direction is nothing more than a last-minute effort to claw back what it had previously discarded. This appears calculated to "make a mockery of the judicial system," allowing LNV to change positions "according to the exigencies of the moment." *Id.*

Even if the Court declined to apply judicial estoppel to LNV's eleventh-hour change in strategy, a damages award based on allocation or collateral value would require a finding of fact that such damages were justified. Not only does no such

finding exist, but the district court found the opposite: "the Court is not persuaded that BB&T's decision to settle the lawsuit without LNV's consent damaged LNV *at all*." [Doc. 218 p.18, emphasis added].

In the closing pages of its brief, LNV asks the Court for remand on the issue of attorneys' fees based on a Georgia statute that allows attorneys' fees where the defendant has acted in bad faith. [LNV Brief p.52–53]. But there has been no factual finding of bad faith in this case. [Doc. 218 p.25 n.24]. And, as the district court pointed out, an award of attorneys' fees in the absence of any evidence of damages "is illegal and void." [*Id.* citing *Benchmark Builders, Inc. v. Schultz*, 711 S.E.1d 639, 640 (Ga. 2011)]. Because LNV has not shown any damages—much less any bad faith—it is not entitled to attorneys' fees.

## CONCLUSION

The Participation Agreement authorized BB&T to act without LNV's consent—and the Court should affirm the judgment on that ground.

On the subject of damages: LNV presented no expert on the law or on judicial processes in Walton County, Florida. It presented no expert on interpreting financial statements or collecting judgments. It presented no appraiser, no financial expert, and no analysis of the time value of money. In fact, LNV did not present a single figure at trial, other than the discredited "full legal balance," from which a factfinder could deduce LNV's damages. As a result, the district court rendered the only

possible judgment—LNV failed to carry its burden of proof on damages. Because no clear error exists in the judgment, this Court should affirm.

Respectfully Submitted,

**KANE RUSSELL COLEMAN & LOGAN PC**

By: s/ David M. Clem _____
      **Kenneth C. Johnston**
      Texas Bar No. 00792608
      **David M. Clem**
      Texas Bar No. 24050428

3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Telephone:  (214) 777-4200
Facsimile:   (214) 777-4299

*—and—*

**PHILIP A. BATES, P.A.**

      **Philip A. Bates**
      Florida Bar No. 228354

25 West Cedar Street
Suite 550
Post Office Box 1390
Pensacola, Florida 32591-1390
Telephone:  (850) 470-0091
Facsimile:   (850) 470-0441

***Attorneys for Defendant,***
***Branch Banking and Trust Company***

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of FRAP 32(a)(7) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 6,990 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

By: /s David M. Clem
**David M. Clem**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system on February 6, 2017.

By: /s David M. Clem
**David M. Clem**