No. 16-14801-G

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT
_____

## LNV CORPORATION,

Plaintiff – Appellant

v.

## BRANCH BANKING AND TRUST COMPANY,

Defendant – Appellee
_____

On Appeal from the United States District Court
Northern District of Florida, Pensacola Division
No. 3:13-cv-00191-MCR-CJK

_____

# APPELLANT'S REPLY BRIEF
_____

James E. Pennington
Texas Bar No. 15758510
LAW OFFICES OF JAMES E. PENNINGTON, P.C.
900 Jackson Street, Suite 440
Dallas, Texas 75202
Telephone: (214) 741-3022
Facsimile: (214) 741-3055
jep@jeplawyer.com

Jeffrey S. Levinger
Texas Bar No. 12258300
LEVINGER PC
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
Telephone: (214) 855-6817
Facsimile: (214) 855-6808
jlevinger@levingerpc.com

Robert A. Ackermann
California Bar No. 155570
CLMG CORPORATION
7195 Dallas Parkway
Plano, Texas 75024
Telephone: (469) 467-5352
Facsimile: (469) 467-7398
RAckermann@clmgcorp.com

Edward P. Fleming
Florida Bar No. 615927
R. Todd Harris
Florida Bar No. 651931
MCDONALD FLEMING MOORHEAD
719 S. Palafox Street
Pensacola, Florida 32502-5813
Telephone: (850) 477-0660
Facsimile: (850) 477-4510
epfleming@pensacolalaw.com
rtharris@pensacolalaw.com

**Attorneys for Appellant LNV Corporation**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fed. R. App. P. 26.1, 11th Cir. R. 26.1-1; 11th Cir. R. 26.1-2, and 11th Cir. R. 26.1-3, LNV Corporation, Appellant, submits its Certificate of Interested Persons and Corporate Disclosure Statement as follows:

1.　　Ackermann, Robert A. – Senior Vice President and Chief Litigation Officer for CLMG Corporation, servicing company for Appellant and underlying Plaintiff, LNV Corporation, and counsel for Appellant.

2.　　Bates, Philip A. – Counsel for Appellee and underlying Defendant, Branch Banking and Trust Company.

3.　　BB&T Corporation (stock ticker: BBT) – Holding company for Appellee and underlying Defendant, Branch Banking and Trust Company.

4.　　Beal Bank USA – Parent corporation of LNV Corporation, Appellant and underlying Plaintiff, LNV Corporation.

5.　　Branch Banking and Trust Company – Appellee and underlying Defendant.

6.　　Clem, David M. – Counsel for Appellee and underlying Defendant.

7.　　CLMG Corporation – Servicing company for LNV Corporation, Appellant and underlying Plaintiff.

8.　　Fleming, Edward P. – Counsel for Appellant and underlying Plaintiff.

9.　　Harris, Randall Todd – Counsel for Appellant and underlying Plaintiff.

10.   Johnston, Kenneth C. – Counsel for Appellee and underlying Defendant.

11.   Kahn, Honorable Charles J., Jr. – Magistrate Judge in the District Court action.

12.   Kane Russell Coleman & Logan PC – Law firm representing Appellee and underlying Defendant.

13.   Levinger, Jeffrey S. – Counsel for Appellant.

14.   LNV Corporation, Appellant and underlying Plaintiff

15.   McDonald Fleming Moorhead – Law firm representing Appellant and underlying Plaintiff.

16.   Pennington, James E. – Counsel for Appellant and underlying Plaintiff.

17.   Rodgers, Honorable M. Casey – Chief United States District Judge in the underlying action.

## **TABLE OF CONTENTS**

Certificate of Interested Persons ........................................................... C-1

Table of Authorities .............................................................................. iii

Introduction ............................................................................................ 1

I.  The district court correctly held that the participation agreement required LNV's consent before BB&T could make any material modification of the Owls Head loan. ........................................................... 3

    A.  BB&T is wrong in claiming that its counsel concluded it could act without LNV's consent. ........................................................... 3

    B.  BB&T's argument that it was authorized "to act decisively post-default" is not supported by the participation agreement. ....................... 5

    C.  BB&T's argument regarding post-default authority ignores the limiting language in paragraph 14(c) and disregards fundamental rules of contract construction. ........................................................... 6

II.  The district court erred in holding that LNV failed to prove its damages from BB&T's breach of contract because the agreement itself establishes a measure of damages. ........................................................... 11

    A.  BB&T misstates LNV's argument about the effect of paragraph 14(b). ........................................................... 11

    B.  The district court applied the wrong standards. ........................................................... 14

    C.  Payment of the full balance owed on the loan is not a windfall to LNV – it was the amount indisputably owed under the agreement. ........................................................... 16

    D.  BB&T's response confuses the benefit of what the parties bargained to receive. ........................................................... 18

III.  The district court erred in both applying the "suit within a suit" framework of legal malpractice cases and in failing to hold that LNV's proof satisfies even the court's erroneously elevated "suit within a suit" framework. ........................................................... 19

i

IV.    The district court lacked the discretion to award LNV zero damages.............22

V.    LNV, as assignee, is entitled to the same rights and remedies as its assignor; therefore, the amount lnv paid for its assignment is irrelevant ........25

Conclusion ............................................................................................................26

Certificate of Compliance .....................................................................................28

Certificate of Service ............................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324
  (11th Cir. 2004) .................................................................................9, 21

*Arawak Aviation, Inc. v. Indemnity Ins. Co. of N. Am.*,
  285 F.3d 954 (11th Cir. 2002) ...............................................................13

*Barger v. City of Cartersville, Ga.,* 348 F.3d 1289 (11th Cir. 2003) ......................23

*Branon v. Ellbee Pictures Corp.*, 155 S.E. 923
  (Ga. Ct. App. 1930)..................................................................................17

*Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*,
  604 F.2d 464 (7th Cir. 1979)...............................................................5, 6

*Citibank, N.A. v. Tele-Resources, Inc.,* 724 F.2d 266
  (2d Cir. 1983) ...........................................................................................25

Clyde Chester Realty Co. v. Stansell, 259 S.E.2d 639
  (Ga. Ct. App. 1979)..................................................................................17

*Construction Aggregate Transport, Inc. v. Florida Rock
  Industries, Inc.*, 710 F.2d 752 (11th Cir. 1983) ...................................12

*Continental Bank N.A. v. Old Kent Bank and Trust Co.*,
  No. 93-C-608, 1994 WL 710301 (N.D. Ill. 1994)................................8

*Cowetta County v. City of Senoia*, 573 S.E. 2d 21
  (Ga. 2002) ...................................................................................................7

*Federated Bank v. FDIC*, 645 Fed. Appx. 853 (11th Cir. 2016)..................... 14, 15

*First Nat. Bank of Louisville v. Continental Illinois Nat. Bank
  and Trust Co. of Chicago*, 933 F.2d 466 (7th Cir. 1991) ...................6

GAB Bus. Servs., Inc. v. Syndicate 627, 809 F.2d 755 (11th Cir.1987)..................4

*Green v. Key Custom Homes, Inc.,* 692 S.E.2d 56
  (Ga. Ct. App. 2010)..................................................................................16

*Horwitz v. Weil*, 569 S.E.2d 515 (Ga. 2002) ......................................................7, 13

iii

*In re Advanced Telecommunication Network, Inc.*,
490 F.3d 1325 (11th Cir. 2007) ................................................................. 23, 24

*In re Fairfield Executive Assocs.,* 161 B.R. 595 (D.N.J. 1993)........................ 25, 26

*In re Nortel Networks, Inc.,* 532 B.R. 494 (Bankr. D. Del. 2015).................... 25, 26

*Joseph Camacho Associates, Inc. v. Millard*, 315 S.E.2d 478
(Ga. Ct. App. 1994)..................................................................................9

*K & M Elec. Supply, Inc. v. Moduplex Corp.,* 686 So.2d 717
(Fla. Ct. App. 1997) ................................................................................26

*Leibel v. Johnson*, 728 S.E.2d 554 (Ga. 2012) ........................................21

*Mimms v. J. L. Betts Co.*, 72 S.E. 271 (Ga. Ct. App. 1911) ....................................17

*National Van Lines, Inc. v. Rich Plan Corp.,* 385 F.2d 800
(5th Cir. 1967)..................................................................................17

Peterson v. Midas Realty Corp., 287 S.E.2d 61 (Ga. Ct. App. 1981) ....................17

*S. Telecom, Inc. v. TW Telecom of Ga. L.P.,* 741 S.E.2d 234
(Ga. Ct. App. 2013)..................................................................................25

*Stonegate Bank v. T.D. Bank, N.A.,* 596 Fed. Appx. 834
(11th Cir. 2015)..................................................................................9, 10

*Sun American Bank v. Fairfield Financial Services,*
*Inc.*, 690 F. Supp. 2d  1342 (M.D. Ga. 2010) ........................................7

*Willesen v. Ernest Communications, Inc.,* 746 S.E.2d 755
(Ga. Ct. App. 2013)................................................................................. 13, 16

**Rules**

Fed.R.App.P. 28(a)(8)(A) ........................................................................21

Fed.R.App.P. 28(b) ................................................................................21

Fed.R.Evid. 702 ..................................................................................21

iv

## INTRODUCTION

Throughout its brief, BB&T tries to create the impression that LNV has already profited from its interest in the Owls Head loan, that LNV is now seeking an unjustified "windfall" from BB&T, and that BB&T is the only loser in this transaction, notwithstanding the district court's decision that BB&T need not pay any damages to LNV for its breach of the participation agreement.  Br. at 2-5, 10, 21-22.  Each of these points is factually inaccurate and legally irrelevant, and none can mask the numerous deficiencies in the district court's ruling on damages.

The "discounted price" that LNV paid for its interest in the Owls Head loan, Br. at 5, is legally irrelevant to LNV's right to recover damages for BB&T's breach of the participation agreement.  LNV acquired its interest by assignment from Magnet Bank; therefore, it stepped into the shoes of Magnet and is entitled to assert all the rights and remedies that belonged to Magnet under the participation agreement and the loan.  That is true regardless of the amount LNV paid for its assignment.

Moreover, far from seeking a "windfall," LNV is requesting only the contractual benefit its assignor bargained for under paragraph 14(b) – namely, the repurchase price to be paid in the event BB&T wished to materially modify the loan documents without obtaining LNV's consent.  Because BB&T breached the agreement by proceeding with the loan modification despite LNV's refusal to

1

consent, the contractual expectations of LNV and its assignor can be protected and fulfilled only by awarding LNV the repurchase price that BB&T would have had to pay had it complied with the agreement.

Finally, BB&T's claim that it lost money on the Owls Head loan, Br. at 21, is not only legally irrelevant to the issue of LNV's damages, it is also factually erroneous. The FDIC paid BB&T approximately $16,500,000 under a loss-sharing agreement covering both the Owls Head and JLD loans. BB&T's disproportionate allocation of the $10,000,000 settlement from Duncan allowed it to avoid its reimbursement obligations to the FDIC. As a result of the district court's indefensible zero-damages award, BB&T has now been able to maximize its return to the detriment of both LNV and the FDIC. That result cannot stand.

## **ARGUMENT**

I. **The district court correctly held that the participation agreement required LNV's consent before BB&T could make any material modification of the Owls Head loan.**

   A. **BB&T is wrong in claiming that its counsel concluded it could act without LNV's consent.**

Much of BB&T's brief attacks the district court's summary judgment ruling that BB&T breached the participation agreement by modifying the Owls Head loan without first obtaining LNV's consent. As part of its attack on that ruling, BB&T asserts that "[a]fter careful review by its counsel, BB&T concluded that the participation agreement authorized it to act without LNV's consent . . . ." Br. at 2. This contention is factually erroneous and BB&T did not even raise it before the court's summary judgment ruling.

The only support BB&T cites in support of this contention is the *trial* testimony from its loan officer. Br. at 2, citing *Doc. 240* at 117-18. Even that testimony does not support BB&T's contention: the loan officer testified she never asked BB&T's outside counsel whether LNV's consent was required to enter into the settlement. *Doc. 240* at 117-18. In fact, documents from BB&T's outside counsel showed they reached the opposite conclusion – LNV's consent *was required*. *PX 35; PX 73; PX 96; PX 98*. As the district court held in its summary judgment order:

3

Moreover, BB&T repeatedly rejected its own attorney's advice to obtain LNV's consent before assigning the loan. For example, prior to the first mediation, BB&T's attorney wrote a memo advising BB&T that if "Duncan offers to write a check for $10 million dollars in order to be released from his guaranties and from all liability, I suspect the participation agreement would require [LNV] to consent," and stating further that "we are likely prohibited from making any decisions involving the Owls Head loan unless it is agreed to by [LNV]." Doc. 127-4, at 24 [*PX 35*]. Without obtaining LNV's consent, BB&T and Duncan agreed to sell and assign the loan at the August mediation and did not inform LNV of the agreement until five days later. Before closing on the sale and assignment, BB&T's counsel again advised BB&T that LNV's consent was likely necessary. See Doc. 124-4, at 28-32 [*PX 96 - 98*]. BB&T nevertheless closed the transaction without LNV's consent. This is further evidence from which a reasonable factfinder could find that BB&T engaged in conscious wrongdoing, which could support a finding of bad faith.

*Doc. 157* at 14.

The loan officer's trial testimony also shows she sought advice from in-house counsel, but there is no evidence of the actual advice in-house counsel provided. *Doc. 240* at 118. Moreover, BB&T is foreclosed from relying on the loan officer's testimony regarding in-house counsel because BB&T invoked the attorney-client privilege and instructed her not to answer questions regarding conversations with in-house counsel. *Doc. 243* at 58-59; *Doc. 205* at 2. BB&T withheld privileged information during discovery, *Doc. 243* at 58-59; *Doc. 205* at 2, thus preventing LNV from corroborating BB&T's alleged claim of reliance on counsel. BB&T may not use the privilege as both a sword and a shield. *GAB Bus. Servs., Inc. v. Syndicate 627,* 809 F.2d 755, 762 (11th Cir.1987). Finally, the loan officer admitted that

BB&T could not materially change the loan documents *without LNV's consent*. *Doc. 240* at 75-76.  Thus, it is disingenuous for BB&T to argue that it relied on its counsel in concluding that LNV's consent was not required.

### B.    BB&T's argument that it was authorized "to act decisively post-default" is not supported by the participation agreement.

In arguing that "participations require lenders to act decisively post-default," Br. at 12-13, BB&T relies on several cases involving the interpretation of different participation agreements.  But none of these cases involves the *same language* contained in the participation agreement at issue here.  For example, BB&T cites to *Carondelet Sav. & Loan Ass'n v. Citizens Sav. & Loan Ass'n*, 604 F.2d 464 (7th Cir. 1979), for the proposition that a lead bank has the power to modify a loan without the consent of its participants.  The facts of that case, however, are distinguishable.

In *Carondelet,* the court held that if the parties had "intended to limit the power of the [lead bank] to modify the loan, this would have been done expressly" in the participation agreement.  *Id*. at 470.  But the participation agreement in *Carondelet* did not contain language limiting the power of the lead bank to modify the loan.  Because the participation agreement did not contain any such language, the court determined that the agreement was ambiguous and considered expert testimony to decide its meaning.  *Id*. at 470.  By contrast, the participation agreement in this case *does* contain language limiting the power of the lead bank to modify the loan.  *See PX 1* at 4.  Therefore, the express terms of the contract prevail.  Further

5

distinguishing this case from *Carondelet*, BB&T advised the district court that the agreement was *unambiguous, Doc. 120* at 11, and offered no expert testimony supporting its interpretation.  Thus, *Carondelet* does not support BB&T's argument.

BB&T also relies on *First Nat. Bank of Louisville v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 933 F.2d 466 (7th Cir. 1991), for the proposition that courts disfavor a condition that allows a minority participant to essentially have veto power over decisions concerning a loan.  Br. at 13.  That case, however, does not stand for the proposition cited by BB&T.  To the contrary, the court *enforced* a provision of the loan agreement that *required the consent* of the participant banks.

> Essentially, the loan agreement forbids an extension of the conversion date *without the unanimous consent of the participating banks*. First National argues that the amendatory agreement that Continental and the other banks made in September 1988 extended the conversion date. It purported to do so, all right, but *the banks could not extend the date without complying with the requirements of the participation agreement*, which all concede they did not do. The amendment was therefore a nullity.

*Id*. at 469 (emphasis supplied).

### C.    BB&T's argument regarding post-default authority ignores the limiting language in paragraph 14(c) and disregards fundamental rules of contract construction.

BB&T's interpretation of the participation agreement – that it authorized BB&T to take any action without LNV's consent after the borrower defaults – is contrary to the plain wording of the agreement.  BB&T ignores the limiting language in paragraph 14(c) – "Except as otherwise provided in this Agreement . . ." – as well

as the provision in paragraph 14(a) requiring LNV's consent.  BB&T also ignores at

least two applicable rules of contract construction.  One is that "the whole contract

should be looked to in arriving at the construction of any part." *Sun American Bank*

*v. Fairfield Financial Services, Inc.*, 690 F. Supp. 2d 1342, 1361 (M.D. Ga. 2010);

*Horwitz v. Weil*, 569 S.E.2d 515, 516 (Ga. 2002) (holding that "[t]he contract is to

be considered as a whole, and each provision is to be given effect and interpreted so

as to harmonize with the others").  The other pertinent rule is that "courts should

avoid any construction that renders portions of the contract language meaningless."

*Horwitz*, 569 S.E.2d at 516; *Cowetta County v. City of Senoia*, 573 S.E. 2d 21, 23

(Ga. 2002) (refusing to adopt interpretation of contract that required one of two

words to be ignored).

The post-default authority that BB&T claims to have under paragraph 14(c)

is expressly limited by the language at the beginning of that same paragraph.

Paragraph 14(c) states in pertinent part:

> *Except as otherwise provided in this Agreement*, Seller shall be entitled,
> at its option, and without the consent of Participant from time to time
> and at any time, to exercise any rights or remedies under or with respect
> to any Loan Document, or refrain from exercising any such right or
> remedy, upon the occurrence of a default under the Loan Documents or
> at any other time . . . .

*PX 1* at 4 (emphasis supplied).  Thus, BB&T's post-default authority under

paragraph 14(c) is expressly limited by other provisions in the agreement, including

paragraph 14(a) – which *requires* LNV's consent before BB&T may take any action

that results in a material change to the loan documents.  BB&T's own lawyers recognized that LNV's consent was required, *PX 35; PX 73; PX 96; PX 98,* and BB&T also recognized that requirement in the mediation settlement agreement. *PX 81* at 2.  Although BB&T now ignores the limiting phrase, "[e]xcept as otherwise provided in this Agreement", Georgia law forbids it from doing so.  By its express terms, paragraph 14(c) applies only if it does not conflict with other provisions in the agreement.

In support of its erroneous argument that the agreement authorized it  to take any post-default action without LNV's consent, BB&T relies on *Continental Bank N.A. v. Old Kent Bank and Trust Co.*, No. 93-C-608, 1994 WL 710301 (N.D. Ill. 1994).[1] Br. at 14-15.  In *Continental Bank*, however, the provision that delegated post-default authority to the lead bank did not contain any limitations on that authority.  *Id*.  Instead, the provision gave the lead bank unlimited authority to enter into agreements affecting the collateral, or to surrender the collateral, upon the occurrence of an event of default.  *Id*.  In contrast, the post-default provision in the BB&T/LNV participation agreement is expressly limited by the language "[e]xcept as otherwise provided in this agreement . . .", and by the terms of paragraph 14(a).

---

[1] Notably, that case applied Michigan law and has never been cited or followed by another court.  Accordingly, it is of questionable relevance to this Georgia-law case.

Accepting BB&T's interpretation would also create an inconsistency between paragraphs 14(a)(iv) and 14(c), which Georgia law does not permit. According to BB&T's interpretation, once a default occurs BB&T may take any action whatsoever, including commencing foreclosure or other legal action, without LNV's consent. Paragraph 14(a)(iv), however, provides that LNV's consent is required before the commencement of any foreclosure or legal action. *PX 1* at 4. Thus, paragraph 14(a)(iv) unambiguously envisions that there are certain post-default actions that require LNV's consent. To the extent BB&T claims an inconsistency between these two provisions, paragraph 14(a) prevails because, under Georgia law, the first and more specific of the two contradictory clauses will prevail. *Joseph Camacho Associates, Inc. v. Millard*, 315 S.E.2d 478, 480 (Ga. Ct. App. 1994).

Finally, BB&T relies on *Stonegate Bank v. T.D. Bank, N.A.,* 596 Fed. Appx. 834 (11th Cir. 2015), for the proposition that competing provisions – which it claims are similar to paragraphs 14(a) and 14(c) in the participation agreement – will render an agreement ambiguous. Br. at 16-17. This argument fails for three reasons. First, BB&T failed to allege the participation agreement was ambiguous before the district court ruled on the agreement's interpretation. "[A]n issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." *Access Now, Inc. v. Southwest Airlines Co.,* 385 F.3d 1324, 1331 (11th Cir. 2004). In fact, BB&T took the *opposite* position before the district court – it claimed the

9

agreement was *unambiguous.  Doc. 120* at 11.  Having advanced this position in the district court, BB&T cannot now assert the opposite position in this Court.

Second, *Stonegate* is distinguishable because the language in the post-default provision at issue in that case is demonstrably different from the post-default provision in this case.  The post-default provision in *Stonegate* (paragraph 16(e)) contained no limiting language, 596 Fed. Appx. at 837, in stark contrast to the post-default provision in paragraph 14(c) stating:  "Except as otherwise provided in this agreement . . . ."  *PX 1* at 4.  The court below correctly held that this language "plainly prohibits BB&T from acting unilaterally without LNV's consent when Paragraph 14(a) provides otherwise."  *Doc. 157* at 7, *citing Stonegate,* 596 Fed. Appx. at 838-39 ("if 'the words in th[e] contract are plain and obvious, they must be given their literal meaning'").

Third, BB&T's reliance on *Stonegate* is misplaced because that case focused primarily on the interaction between paragraph 16(b) and paragraph 18, which contained language that is not at issue in this case.  *Id.* at 843-44.  And contrary to BB&T's position, Br. at 17-18, *Stonegate* does not support an application of the rule of *contra proferentem.*  As this Court stated in *Stonegate*, "the logic of this rule is less persuasive where, as here, the parties are both sophisticated entities engaged in their own lines of business.  The rule of *contra proferentem* thus applies with less force and is 'overcome by the strength' of other rules."  *Id.* at 844.  Those rules

10

support the district court's holding that LNV's consent was required before BB&T

could make any material modifications to the Owls Head loan.

**II.    The district court erred in holding that LNV failed to prove its damages from BB&T's breach of contract because the agreement itself establishes a measure of damages.**

>**A.    BB&T misstates LNV's argument about the effect of paragraph 14(b).**

BB&T mischaracterizes LNV's argument about how paragraph 14(b)

establishes the proper measure of damages. LNV does not argue that the

participation agreement punishes *any* breach by requiring BB&T to pay the full legal

balance of the loan; rather, LNV's argument is specifically based on BB&T's breach

of paragraph 14(a) by unilaterally changing the loan documents.  The next paragraph

– 14(b) – reflects the measure of damages the parties contemplated for the specific

breach of paragraph 14(a) that BB&T committed.  Requiring BB&T to pay the price

in paragraph 14(b) does not make BB&T a "guarantor" of the loan; rather, it makes

BB&T accountable for the specific breach it committed.

Any other result would allow BB&T to retain the benefit it derived from its

breach of paragraph 14(a) – namely, materially changing the loan documents without

first obtaining LNV's consent – *without* paying the price originally contemplated by

the parties. BB&T breached the agreement, but it has paid LNV only $577,000.  If

BB&T had complied with the agreement, the only way it could have modified the

loan documents – without LNV's consent – would have been to pay LNV

11

$7,975,970, the repurchase price in paragraph 14(b). These two scenarios are juxtaposed below:

| **Scenario Involving Breach:** | **Scenario Contemplated by Parties:** |
| --- | --- |
| 1. BB&T requests LNV's consent to materially change loan documents | 1. BB&T requests LNV's consent to materially change loan documents |
| 2. LNV refuses to consent | 2. LNV refuses to consent |
| 3. BB&T proceeds to change loan documents despite LNV's refusal to consent | 3. BB&T repurchases loan under paragraph 14(b) so it can proceed without LNV's consent |
| 4. Price paid by BB&T: $577,000 | 4. Price paid by BB&T: $7,975,970 |

Despite BB&T's rhetoric about LNV seeking a windfall, BB&T is the party who *actually received a windfall of $7,398,970*. If allowed to stand, this result would enable BB&T to profit by its wrongdoing at LNV's expense – a result that is contrary to the law of Georgia and this Court. *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752, 785-86 (11th Cir. 1983).

In support of its argument, BB&T also relies on the district court's pretrial ruling that LNV was not entitled to a presumption of damages because the participation agreement "was subject to risk and loss." Br. at 19, *citing Doc. 203* at 3. This ruling, however, was erroneous. Although the agreement was subject to *certain types* of risk and loss, such losses did *not* include BB&T's breach of contract

– particularly this type of breach, which intentionally reduced the loan amount from $34,557,929 to $2,500,000 and terminated the loan documents.

It appears the district court, in its pretrial order, was referring to paragraph 5 (Losses and Expenses) of the participation agreement. *See PX 1* at 1-2. The language at the end of paragraph 5, however, excludes losses resulting from BB&T's bad faith, gross negligence or willful misconduct. *PX 1* at 1-2. BB&T's breach of paragraph 14(a) is the type of conduct that was excluded from paragraph 5. Accordingly, LNV was not responsible for sharing in losses caused by BB&T's breach of contract. If paragraph 5 were to be construed to protect BB&T from losses resulting from its own breach of contract, the entire agreement would be rendered meaningless, contrary to Georgia law. *Horwitz*, 569 S.E.2d at 516; *see also Arawak Aviation, Inc. v. Indemnity Ins. Co. of N. Am.*, 285 F.3d 954, 957 (11th Cir. 2002) (courts should avoid interpretation of contract that leads to an absurd result).

Ultimately, regardless of whether the agreement was subject to the risk of such losses, the district court still erred in determining that LNV was not entitled to a presumption of damages. As demonstrated in LNV's principal brief, LNV established the amount it was presumptively owed under the agreement, and the burden then shifted to BB&T to prove any reduction of the amount to which LNV was lawfully entitled. LNV Br. at 25-6, *citing Willesen v. Ernest Communications, Inc.,* 746 S.E.2d 755 (Ga. Ct. App. 2013). BB&T failed to meet its burden.

13

**B.    The district court applied the wrong standards.**

BB&T has no answer to LNV's argument that the rule regarding speculative damages relates to causation – not the amount of damages – and that the district court confused these two proof requirements.  Thus, BB&T fails to explain how its breach – reducing the loan amount from $34,557,929 to $2,500,000 without LNV's consent – did not cause any damages to LNV.  Instead, BB&T argues that this case is "strikingly similar" to the facts in *Federated Bank v. FDIC*, 645 Fed. Appx. 853 (11th Cir. 2016).  Br. at 19-20.  But *Federated* is materially different.

In *Federated*, the FDIC obtained a judgment against the borrower and later settled with him for a lesser amount.  *Id.* at 855.  Unlike this case, the participation agreement in *Federated* provided consent in advance and authorized the FDIC to materially modify or terminate the loan documents.[2]  Thus, unlike this case, the plaintiff in *Federated* did not and could not claim that the FDIC breached the participation agreement by entering into the settlement and reducing the amount owed on the loan without consent. Instead, the primary claim of breach in *Federated* was very different: it involved the FDIC's alleged failure to provide information to

---

[2] *See* BB&T's Appendix, Doc. 186-1 (Appendix at 167). Paragraph 15(b) in the *Federated* agreement provides "Participating Bank hereby consents in advance to, and authorizes SILVERTON BANK, in its reasonable discretion, to make or consent to: (i) any modification, amendment, or termination of any of the material terms or conditions of the Loan Documents . . . ."

the participant bank.  *Id.* at 859.[3]  As this Court recognized in *Federated*, precise legal damages caused by that particular type of breach would be impossible to calculate because it would require speculation into what the participant would have done with the information.  *Id.* at 859.

In contrast to the breach alleged in *Federated*, BB&T's breach involved reducing the amount owed on the loan from $34,557,929 to $2,500,000.  The damages caused by this breach are obvious and require no speculation about how LNV was harmed.  As the district court held, BB&T's breach effectively extinguished LNV's rights to all future payments under the loan.  *Doc. 157* at 10.

Additionally, the plaintiff in *Federated* offered no evidence of how the failure to provide the information caused it to suffer any damage (i.e., that it would have taken different action had it been aware of the undisclosed information).  *Id.* at 859.  In contrast, LNV offered evidence of the guarantor's financial statement, which showed that – when the breach occurred – he had the ability to pay the entire amount owed on the loan.  *PX 117.*

---

[3] In *Federated*, a second claim of breach involved the failure to liquidate collateral securing the note – approximately 44,000 shares of stock in a privately held company with no public market.  *Id.* at 859.  The value of the stock was disputed and the plaintiff failed to provide any evidence of its value.  *Id.* at 859-60.  In contrast, BB&T *stipulated* to the value of the collateral securing the loan. *Doc. 183* at 86.

15

### C. Payment of the full balance owed on the loan is not a windfall to LNV – it was the amount indisputably owed under the agreement.

BB&T is also incorrect in arguing that payment of the full amount owed would give LNV a "windfall" by putting LNV in a far better position than it would have been in under any plausible scenario. Br. at 22. To the contrary, payment of this amount would not put LNV in a better position under any scenario because this is the amount contractually owed to LNV. The case BB&T cites, *Green v. Key Custom Homes, Inc.,* 692 S.E.2d 56 (Ga. Ct. App. 2010), actually supports LNV's position. In *Green*, the court held that an injured party cannot be placed in a better position than he would have been in if the contract had not been breached; but the court also stated that the plaintiff "would be entitled to recover what it would have earned under the Agreement in the absence of the breach." *Id.* at 804. This is exactly what LNV seeks to recover – the amount it would have earned under the agreement had BB&T complied with it. Allowing LNV to recover this amount does not constitute a windfall.

Further, "[i]t is axiomatic that when a plaintiff offers evidence establishing the amount it has earned under a contract and the defendant disputes that amount, the burden is on the defendant to prove the amount by which the plaintiff's damages should be reduced." *Willesen,* 746 S.E.2d at 762-63. BB&T attempts to distinguish *Willesen* on the basis that it involved a different type of payment structure, Br. at 25, but the holding in *Willesen* is consistent with broader principles of Georgia law. *See*

16

*Peterson v. Midas Realty Corp.,* 287 S.E.2d 61 (Ga. Ct. App. 1981) (in suit for breach of lease and guaranty, plaintiff's evidence of amount due under contract established prima facie case and burden shifted to defendant to rebut correctness of that amount); *Clyde Chester Realty Co. v. Stansell,* 259 S.E.2d 639 (Ga. Ct. App. 1979) (in suit for breach of agency contract, burden was on defendant to plead and prove any diminution of damages); *Branon v. Ellbee Pictures Corp.*, 155 S.E. 923 (Ga. Ct. App. 1930) (in suit for breach of contract to lease motion pictures, plaintiff established prima facie case for full amount owed under the contract and burden shifted to defendant to prove plaintiff's damages were less); *Mimms v. J. L. Betts Co.*, 72 S.E. 271 (Ga. Ct. App. 1911) (in suit for breach of contract to perform services, measure of recovery is prima facie full payment under the contract and burden shifted to defendant to prove damages were less).

The same burden-shifting rule was followed in *National Van Lines, Inc. v. Rich Plan Corp.,* 385 F.2d 800 (5th Cir. 1967). In *National Van Lines,* the Court held that the plaintiff's damages must be measured by the amount of loss the plaintiff actually suffered by the breach. *Id.* at 803. Additionally, the Court held that once the plaintiff showed the goods were delivered and that the carrier failed to collect for the goods, "a prima facie case is established that the *amount to be collected is the correct measure of damages*." *Id.* at 803 (emphasis supplied). At that point, the burden shifted to the defendant to prove the damages were less. *Id.* at 803. *National*

17

*Van Lines* confirms that the district court erred in holding that the agreement did not establish a proper measure of damages and that LNV did not prove its damages. LNV established a prima facie case for the full amount under the Owls Head loan, and the burden shifted to BB&T to show any reduction to which it was entitled. BB&T failed to meet this burden.

### D.    BB&T's response confuses the benefit of what the parties bargained to receive.

BB&T responds to LNV's "benefit of the bargain" argument by creating confusion over what the parties bargained for.  According to BB&T, "the parties never bargained for BB&T to guarantee the loan or for LNV to receive any certain sum from its purchase."  Br. at 23.  It is true the parties never bargained for BB&T to "guarantee the loan," but LNV has never asserted that argument.  The latter part of BB&T's statement, however, is incorrect: the parties to the participation agreement did bargain for a specific price to be paid if the lead bank wished to benefit by materially modifying the loan without the participant's consent.

BB&T distracts by arguing that it had no contractual "obligation" to purchase LNV's interest in the loan merely because LNV refused to consent to the settlement with Duncan.  Br. at 22.  That is true, but once BB&T decided to proceed with the settlement after LNV refused to consent, this triggered a corresponding obligation to pay LNV the purchase price for the benefit of that bargain.  BB&T had a choice: (1) it could terminate the settlement agreement based on LNV's refusal to consent

18

(the mediated settlement agreement contained a provision that made it subject to the participant's approval – *PX 81* at 2); or (2) it could proceed with the settlement, including the material modification of the loan documents, despite LNV's refusal to consent.  BB&T chose the latter option.  *This* was the benefit that BB&T obtained – it accomplished the settlement and material modification of the loan documents without obtaining LNV's required consent – and it now must pay the requisite price for doing so.

Additionally, there is no merit to BB&T's argument that LNV bargained for an interest in a defaulted loan where it would share in any losses, including losses that are a logical consequence of action taken by BB&T in response to a default.  Br. at 23.  As discussed above, this argument ignores the exclusionary language at the end of paragraph 5.

**III.  The district court erred in both applying the "suit within a suit" framework of legal malpractice cases and in failing to hold that LNV's proof satisfies even the court's erroneously elevated "suit within a suit" framework.**

BB&T fails to cite any case that has applied a legal malpractice "suit within a suit" standard to the calculation of damages in a breach of contract claim.  There is none.  As the authorities previously cited by LNV demonstrate, the district court erred in applying that standard to this breach of contract case.

Regardless, LNV's evidence satisfied even the court's erroneous standard.  BB&T argues incorrectly that LNV offered no evidence of what would be required

19

to obtain a judgment or the chance of success in the underlying state court lawsuit. Br. at 26-27. BB&T ignores the evidence discussed in LNV's brief: the motion for summary judgment filed by BB&T's own lawyers; and the memo, letter, and testimony from BB&T's own lawyers that BB&T's chance of success in the underlying lawsuit was 70-80% and even higher in the event of an appeal. *PX 28, 29; Doc. 244* at 18, 92-93. BB&T offers no explanation and cites no authority for why this evidence does not satisfy the court's standard of requiring proof that BB&T would have prevailed in the underlying lawsuit. Under any circumstance, a 70-80% chance of success satisfies the preponderance of the evidence standard.

BB&T also states incorrectly that there was no evidence of the cost or time it would take to obtain a judgment in the underlying lawsuit. Br. at 27. Again, BB&T cites no authority requiring LNV to prove such matters. In any event, BB&T's own lawyer testified that he anticipated it would have taken only a few months to obtain a summary judgment following a hearing. *Doc. 244* at 108. If summary judgment was granted, as BB&T's lawyer predicted, the remaining cost would be minimal because BB&T's motion had already been filed. Even if the litigation continued, BB&T's lawyer provided an estimate of the additional costs. *PX 63* at 3.

Equally meritless is BB&T's assertion that LNV presented no expert to testify about the law or on judicial processes in Walton County (along with an assortment of other topics). Br. at 30. BB&T cites to no authority requiring any such expert

20

testimony. An "argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." *Access Now, Inc.*, 385 F.3d at 1330; *see also* Fed.R.App.P. 28(a)(8)(A) and 28(b). Moreover, legal malpractice is the only possible area in which such expert testimony would be required; but even in legal malpractice cases, expert testimony is required only to establish an attorney's negligence. Expert testimony is not required to establish causation, including what the outcome would have been in the underlying lawsuit but for the attorney's negligence. *Leibel v. Johnson*, 728 S.E.2d 554, 556 (Ga. 2012).

Finally, expert testimony is required only if it would assist the trier of fact. Fed.R.Evid. 702. In this case, the trier of fact was a district judge, who was better positioned than any expert to decide how another judge should have ruled on BB&T's motion for summary judgment. Also, as the district court observed, whether a judgment would have been collectible is a matter for the factfinder – not an expert. *Doc. 218* at 18. Accordingly, no expert was needed to address any collection issues or to interpret the guarantor's financial statement. In any event, witnesses for both LNV and BB&T testified extensively, without objection, about both collection issues and the guarantor's financial statement. *Doc. 240* at 210-218; *Doc. 241* at 61-64; *Doc. 242* at 83-84.

## IV.     The district court lacked the discretion to award LNV zero damages.

BB&T fails to address the authorities cited in section IV of LNV's brief, which demonstrate that the district court erred in awarding zero damages for BB&T's breach of contract.  Instead, BB&T complains that it would be improper to award damages based on a reallocation of the settlement amount or on the value of the collateral because those damages would be based on "damage models that LNV had expressly disclaimed."  Br. at 29.  But LNV disclaimed nothing; it explained to the district court that its damages should not be *limited* to a reallocation of the settlement because that ignored the $32,000,000 reduction of the loan.  *Doc. 240* at 30-31.  By requesting the full amount of its damages, LNV did not waive the right to a lesser amount.  The damages relating to the settlement reallocation and the collateral value demonstrate that, even if the court believed the entire loan amount would not have been collected, the court should have awarded at least these lesser amounts.

BB&T also mischaracterizes LNV's damages theories, arguing that LNV's primary theory was based on what LNV claims "*would have happened*" had BB&T not settled with Duncan.  Br. at 6, citing *Doc. 42* at 12 (emphasis original).  LNV's amended complaint, the document cited by BB&T, actually stated:

> The foregoing breaches by BB&T have damaged LNV, including by destroying its 23.08% interest in the Owls Head Loan, which is equivalent to a loss of $ 7,452,131.52, or such other sum as LNV may

22

> show would have been recoverable from Owls Head and the Guarantors
> under the terms of the Owls Head Loan documents.

*Doc. 42* at 12.  An accurate reading of this statement does not support BB&T's argument.  BB&T is also wrong in arguing that LNV explicitly recognized in its trial brief the requirement of showing "what would have happened."  Br. at 8.  The language BB&T cites is contained in a section of LNV's trial brief explaining why the amount LNV paid for its assignment was irrelevant.  *Doc. 184* at 9-10.  LNV then explained its damages in the next section of the trial brief, including an argument that it had already established a prima facie measure of damages and that BB&T had the burden to rebut this presumption.  *Doc. 184* at 24-27.

Relying on *Barger v. City of Cartersville, Ga.,* 348 F.3d 1289, 1293–94 (11th Cir. 2003), BB&T also asks this Court to apply judicial estoppel to prevent LNV from urging alternative damage theories.  Br. at 29.  BB&T's request is meritless because it ignores the most important factor in determining whether to apply judicial estoppel – namely, "a party's allegedly inconsistent positions must have been '*made under oath in a prior proceeding.*'"  *Id.* at 1293 (emphasis supplied).  LNV's statements were *not* made under oath, they do not reflect a change in LNV's position, and they certainly do not "make a mockery of the judicial system."  Br. at 29.

The district court's error in awarding zero damages is underscored by this Court's valuation analysis in *In re Advanced Telecommunication Network, Inc.*, 490 F.3d 1325 (11th Cir. 2007), which held that a bankruptcy court erred in assigning a

23

value of zero to an ongoing lawsuit between the debtor and a third party. *Id*. at 1335. Acknowledging that no one can predict the result of litigation with any reasonable certainty, the Court held that such a precise prediction is not required. *Id*. Instead, the bankruptcy court was "required to calculate the present value of the liability – the expected cost of the liability times the estimated chance of it ever occurring." *Id*.

> Thus in this case the bankruptcy court should have estimated the expected value of a judgment against ATN (ATN's own lawyers had already placed it in the millions well before the case actually settled for $10.5 million), and then multiplied that value by the chance that ATN would face such a judgment (thus, for example, halving the judgment's value if ATN faced only a fifty percent chance of an adverse judgment).

*Id*. Because the evidence showed there was a very real prospect of a judgment, the bankruptcy court was not justified in simply assigning a dollar value of zero to the contingent liability (the equivalent of saying that there was no chance any liability would be incurred). *Id*. at 1335-36.

Under the same reasoning, the district court was not justified in awarding zero dollars to LNV when the evidence showed there was a 70-80% chance of success in BB&T's state court lawsuit (and even higher on appeal). If this Court's valuation approach in *Advanced Telecommunication Network* had been applied to BB&T's suit, it would have yielded a valuation between $5,583,179 and $6,380,776, based on the probability estimates of BB&T's own lawyers:

24

| | 70% Valuation | 80% Valuation |
|---|---|---|
| Loan amount | $34,557,929 | $34,557,929 |
| Chance of success | x   70% | x   80% |
| Subtotal | $24,190,550 | $27,646,343 |
| LNV's interest | x  23.08% | x  23.08% |
| **LNV's damages** | **$ 5,583,179** | **$6,380,776** |

## V.    LNV, as assignee, is entitled to the same rights and remedies as its assignor; therefore, the amount LNV paid for its assignment is rrrelevant.

Because BB&T stipulated that LNV acquired Magnet Bank's interest in the Owls Head loan by assignment, *Doc. 183* at 85, its repeated references to the amount LNV paid for its assignment are legally irrelevant.  Under Georgia law, an assignee "stands in the shoes" of the assignor. *S. Telecom, Inc. v. TW Telecom of Ga. L.P.,* 741 S.E.2d 234, 237 (Ga. Ct. App. 2013).  An assignment is intended to change only who performs an obligation, not the obligation to be performed.  *Id.* at 238.  "An assignment does not modify the terms of the underlying contract.  It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged." *Citibank, N.A. v. Tele-Resources, Inc.,* 724 F.2d 266, 269 (2d Cir. 1983).

The law is also well established that the amount of consideration paid by an assignee to an assignor is irrelevant to the assignee's rights.  *In re Nortel Networks, Inc.,* 532 B.R. 494, 560 (Bankr. D. Del. 2015); .*In re Fairfield Executive Assocs.,*

25

161 B.R. 595, 598, 602 (D.N.J. 1993) "[T]he assignee may recover the full amount the assignor would have been entitled to recover; his or her recovery is not limited to the amount he or she paid in exchange for the assignment." 6A C.J.S. Assignments § 110. *See also K & M Elec. Supply, Inc. v. Moduplex Corp.,* 686 So.2d 717 (Fla. Ct. App. 1997). This principle unquestionably applies to the assignment of negotiable instruments. *In re Nortel Networks, Inc.,* 532 B.R. at 560; *In re Fairfield Executive Assocs.,* 161 B.R. at 598, 602.

In fact, BB&T itself relied on this established rule in the state court lawsuit it filed against Duncan involving the Owls Head loan. *PX 34* at 28. Just as BB&T argued in the state court lawsuit that, as the assignee of Colonial Bank, it was entitled to recover the full amount due under the Owls Head loan, LNV, as assignee of Magnet Bank, is also entitled to recover its 23.08% share of the full amount due under that loan.

## CONCLUSION

LNV requests the relief sought in its principal brief. *See* LNV Br. at 53.

26

Respectfully submitted,

Robert A. Ackermann
California Bar No. 155570
CLMG CORPORATION
7195 Dallas Parkway
Plano, Texas 75024
Telephone: (469) 467-5352
Facsimile: (469) 467-7398
RAckermann@clmgcorp.com

Edward P. Fleming
Florida Bar No. 615927
R. Todd Harris
Florida Bar No. 651931
MCDONALD FLEMING
MOORHEAD
719 S. Palafox Street
Pensacola, Florida 32502-5813
Telephone: (850) 477-0660
Facsimile: (850) 477-4510
epfleming@pensacolalaw.com
rtharris@pensacolalaw.com

*/s/ James E. Pennington*

James E. Pennington
Texas Bar No. 15758510
LAW OFFICES OF JAMES E.
PENNINGTON, P.C.
900 Jackson Street, Suite 440
Dallas, Texas 75202
Telephone: (214) 741-3022
Facsimile: (214) 741-3055
jep@jeplawyer.com

Jeffrey S. Levinger
Texas Bar No. 12258300
LEVINGER PC
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
Telephone: (214) 855-6817
Facsimile: (214) 855-6808
jlevinger@levingerpc.com

***Attorneys for Appellant***
***LNV Corporation***

27

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,464 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ James E. Pennington*
James E. Pennington
Texas Bar No. 15758510
LAW OFFICES OF JAMES E. PENNINGTON, P.C.
900 Jackson Street, Suite 440
Dallas, Texas 75202
Telephone: (214) 741-3022
Facsimile: (214) 741-3055
jep@jeplawyer.com

**Attorneys for Appellant**
**LNV Corporation**

Dated: February 20, 2017

28

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of this Appellant's Reply Brief was provided by electronic delivery and by U.S. mail to the following counsel of record on this 20th day of February, 2017:

Kenneth C. Johnston
David M. Clem
KANE RUSSELL COLEMAN & LOGAN PC
1601 Elm Street, Suite 3700
Dallas, Texas 75201

Philip A. Bates
PHILIP A. BATES, P.A.
25 West Cedar Street, Suite 550
Pensacola, Florida 32502

*/s/ James E. Pennington*
JAMES E. PENNINGTON